## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **DELILAH MULHOLLAND,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:06-CV-2913-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,**[1] | : | |
| *Commissioner of Social* | : | |
| *Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[2]

Plaintiff Delilah Mulholland ("Plaintiff") brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to

obtain judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") Benefits under the Social

---

[1]     Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is "automatically substituted" as Defendant. FED. R. CIV. P. 25(d)(1).

[2]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [*See* Doc. 8; Dkt. Entry dated 4/4/2007]. Therefore, this Order constitutes a final Order of the Court.

Security Act ("the Act").[3]  For the reasons stated below, the Court **REVERSES AND REMANDS** for further proceedings consistent with this Order and Opinion.

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on July 10, 2003, alleging disability commencing on June 15, 1999.  [Record (hereinafter "R") R57-59].  Plaintiff's application was denied initially and on reconsideration.  [*See* R27-30, 34-37].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [*See* R40-41].  An evidentiary hearing was held on May 3, 2005.  [R161-93].  The ALJ issued a decision on June 16, 2005, denying Plaintiff's claims on the grounds that she had not been under a "disability" at any time through the date of the decision.  [R14-24].

---

[3]      Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F.Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

Plaintiff sought review by the Appeals Council and on September 27, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  [R4-6].

Plaintiff then filed an action in this Court on November 9, 2006, seeking review of the Commissioner's decision.  *Delilah Mulholland v. Jo Anne B. Barnhart*, Civil Action File No. 1:06-cv-2913.  [Doc. 3].  The answer and transcript were filed on March 21, 2007.  [Docs. 5-6].  The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs and oral argument, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Medical Records*[4]

Plaintiff had a polypectomy of an adenomatous polyp in June 1999. A colonoscopy in March 2000 revealed left colon diverticulosis (a condition of the intestine in which abnormal pouches are present, which may lead to bleeding or

---

[4]    Unless otherwise specified, the Court has obtained its descriptions and definitions of medications and medical terms through various resources at the Medline Plus website, http://medlineplus.gov/ (last visited March 7, 2008).

3

constipation) and internal/fused hemorrhoids.[5]  [*See* R108, 126-27].  The rest of the colon appeared normal.  [R127].

On August 9, 2000, Plaintiff went to the eye clinic at Grady Memorial Hospital ("Grady").  Plaintiff was told to return in one year.  [R119].   In what appears to be October 2000, Plaintiff went to Grady where her medications were refilled.  Plaintiff indicated that she was feeling okay, and the medical note indicated that Plaintiff's hypertension was elevated.  [R118].

On July 31, 2001, Plaintiff went to the Grady eye clinic complaining of seeing "water fall."  She had a small retinal hole.  She was told to return in six to nine months.  [R115].

Sometime around January 2002, Plaintiff was assessed with hypertension and had her medications refilled.  [R113-14].  On February 21, 2002, Plaintiff went to Grady for management of her hypertension.  Plaintiff complained of blood in her stools.  [R111].  A medical note indicated that Plaintiff had a colonoscopy revealing internal hemorrhoids and left sided diverticulitis.  The doctor noted that Plaintiff needed to

---

[5]     Internal hemorrhoids occur just inside the anus at the beginning of the rectum when pressure in the veins of the anus cause the veins to bulge and expand causing pain, especially when sitting.  They are commonly caused by straining during bowel movements as a result of constipation or by sitting for long periods of time.

4

control her hypertension better, so he increased her blood pressure medication, Lisinopril, and encouraged her to exercise more and decrease the sodium in her diet. [R112]. The medical notes also indicated that Plaintiff's "Psych" was normal. [R111-12].

On May 1, 2002, Plaintiff had a barium swallow study because of difficulty swallowing. Plaintiff had no evidence of hiatal hernia, gastroesophageal reflux, or constricting or obstructing lesions. The esophagus showed decreased peristaltic activity (involuntary contractions in the esophagus to force contents onward) with esophageal escape and tertiary contractions (diffuse esophageal spasms that produce indentations and pseuodiverticular deformities).[6] [R110].

Also, in May of 2002, Plaintiff went to Grady to followup for her hypertension. Plaintiff complained of pain while defecating and occasional blood in her stool. [R124]. The medical assessment indicated that Plaintiff's hypertension needed better

---

[6]     The Court was unable to find a definition for the term "esophageal escape," but infers that the medical note referred to "[t]he medical term for the escape of acid from the stomach back into the esophagus is reflux or gastroesophageal reflux disease (GERD)." American Cancer Society, Cancer Reference Information, http://www.cancer.org/docroot/CRI/content/CRI_2_4_1X_What_is_esophagus_cancer_12.asp (last visited Mar. 11, 2008). The definition for tertiary contractions was found at a Cleveland Clinic website. Edgarr Achkar, Motor Disorders of the Esophagus, http://clevelandclinicmeded.com/diseasemanagement/gastro/motor/motor.htm (last visited Aug. 10, 2007).

AO 72A
(Rev.8/8
2)

control, so she was given another medication and was encouraged to exercise and lose weight. Plaintiff was referred to the gastrointestinal ("GI") clinic for her GI problems. [R125].

On May 17, 2002, Plaintiff went to the Grady eye clinic where she complained of pain and floaters. She had a small hole in her eye. Plaintiff was told to return in 9 to 10 months. [R109].

Plaintiff went to Grady on May 30, 2002, complaining of occasional blood in her stools and painful defecation. Her attempts to soften the stool were unsuccessful. The doctor recommended that Plaintiff have a repeat colonoscopy. [R108]. A Grady note on July 16, 2002, indicated that Plaintiff presently complained of constipation and pain on defecation. [R106]. Plaintiff was diagnosed with diverticulosis and hemorrhoids. She was instructed to return to the GI clinic in three years for a colonoscopy. [R107].

Plaintiff underwent a barium swallow on July 23, 2002. She was diagnosed with a small hiatal hernia (a condition in which a part of the stomach protrudes up into the chest through an opening in the diaphragm, causing reflux of gastric acid) and esophageal web (structural abnormalities in the esophagus that are normally

6

asymptomatic but can cause dysphagia (difficulty swallowing)).[7]  [R105].  Plaintiff

went to Grady on August 9, 2002, complaining about blood in the stool and pain from

hemorrhoids.   Plaintiff was placed on a conservative plan for one month before

reassessment, which included sitz baths (warm water bath used for healing and

cleansing), eating high fiber foods, taking a teaspoon of psyllium (a fibrous substance

used as a laxative), and taking colace (a stool softener medication).  [R123].

Plaintiff was seen at Grady on August 29, 2002, for a follow up of her

hypertension and hemorrhoids.  The medical history note indicated that Plaintiff was

seen by GI and general surgery for her hemorrhoids, which recommended a

conservative approach.   The attending note indicated that Plaintiff had not been

compliant with her hypertension and cholesterol medications.  [R121].  Plaintiff was

given the following assessment: (1) improved symptoms with hemorrhoids, which were

being evaluated in the surgery clinic; (2) no change for the elevated hypertension, but

Plaintiff was encouraged to exercise and follow a low sodium diet; and (3) increased

cholesterol although Plaintiff was not following the drug regimen.  [R122].

---

[7]    *See* Xaralabos Zervos, Esophageal Webs and Rings, http://www.emedicine.com/med/topic3413.htm (last visited Mar. 10, 2008).

AO 72A
(Rev.8/8
2)

On September 6, 2002, Plaintiff went to Grady complaining of constipation, fatigue, nausea, blood in her stools, and painful defecation. Plaintiff was given mineral oil to soften her stools, and she was told that she would have a repeat colonoscopy. [R103]. Plaintiff returned to Grady on October 1, for evaluation of her hemorrhoids. She was told to continue with the stool softener and with her high fiber diet. [R102].

Plaintiff went to the Grady eye clinic on January 6, 2003, for a check up. The note indicated that Plaintiff was obese and that she had a history of "GED," strabissmus (cross eyed) surgery, a peripheral hole in her retina, and blepharitis (inflammation of the lash follicles at the eyelid). Plaintiff was told to follow up in six months for a "HVF." [R120].[8]

Plaintiff went to Grady urgent care complaining of left neck swelling in January of 2003. A medical exam indicated that the neck started swelling four days after Plaintiff developed tooth swelling. Plaintiff's tooth pain was persisting and getting progressively worse. She had tenderness in her first lower molar on the left side with obvious swelling of gums. Plaintiff was diagnosed with a tooth infection and lymph node swelling. She was referred to a dentist. [R101].

---

[8]    It appears that this is an abbreviation for a Humphrey Visual Field, which is used to test peripheral vision and detect the loss of peripheral vision.

8

In May 2003, Plaintiff went to Grady for follow up of her hypertension.  Plaintiff reported that she had experienced heartburn that she could not control with lifestyle modification.  [R99].  The following assessment was entered: (1) hypertension - - increase Toprol XL; (2) diverticulosis - - continue high fiber diet; and (3) increased cholesterol - - controlled on Fluvastatin.  Plaintiff's next appointment was scheduled in five to six months.  [R100].

Plaintiff had a June 9, 2003, appointment with the eye clinic in which she reported no pain.  Plaintiff was described as obese.  Her appointment was for "HVF." The medical notes indicated that Plaintiff had a history of Graves disease but no history of ocular problems.  Plaintiff also had a history of strabismus (crossed eyes).  Plaintiff had no new complaints and no floaters with her peripheral retinal hole.  The medical assessment indicated that Plaintiff had a history of a thyroid disorder but was not treated.  Plaintiff's "VF" (visual field) was within normal limits, and her strabismus was stable.  Plaintiff also had blepharitis (inflammation of the eyelid).  [R98].

Plaintiff went to the Grady eye clinic on November 4, 2003.  Plaintiff reported no pain, but complained of intermittent "gritty" feeling.  Plaintiff was described as obese.  Plaintiff was assessed with: (1) blepharitis; (2) peripheral retinal hold in the

AO 72A
(Rev.8/8
2)

right eye that was longstanding and stable; (3) a history of strabismus and thyroid dysfunction; and (4) a visual field defect in the left eye.  [R144].

Plaintiff went to the Grady emergency room on November 24, 2003, complaining of left neck pain that stabbed into the head.  The pain had been occurring for several months, but it worsened in the past week.  The pain was relieved with Excedrin. [R142].  The attending note indicated that Plaintiff had an arm tremor and a chronic neck tic, leading to a diagnosis of neck pain and right arm tremor.  Plaintiff was referred to neurology.  [R143].

On February 5, 2004, Plaintiff went to the Grady urgent care center complaining of blood in her stool and constipation.  Plaintiff was given medication to reduce constipation and referred to Dr. Grow.  [R141].

Plaintiff went to Grady for management of her hypertension on March 27, 2004. The medical note indicated that Plaintiff had a colonoscopy scheduled for December 2004, but she was doing okay otherwise.  The note also indicated that Plaintiff was still getting over the death of her mother in July 2003.  Plaintiff reported improvement in her gastroesophageal reflux disease ("GED") symptoms and no abdominal pain.  She indicated that she did not have time to exercise, and she did not watch her diet. Plaintiff's psychological condition was normal without depression and with good

10

energy.   The doctor noted that Plaintiff had the following medical history: (1) hypertension; (2) degenerative joint disease; (3) internal hemorrhoids; (4) increased cholesterol; (5) chronic lower back pain; (6) diverticulosis; (7) hiatal hernia; and (8) Graves disease.   [R139].   Plaintiff was assessed with diverticulosis and put on conservative management with a high fiber diet.   Plaintiff was also diagnosed with menopause.   [R140].

On April 19, 2004, Plaintiff went to Grady complaining of discharge and left side pain for three to four months.   Plaintiff rated her pain as two.   [R136].   Plaintiff was assessed with: (1) hypertension, leading her to be counseled on a low sodium diet; (2) history of tubulovillous adenoma (a polyp that grows in the colon or other gastrointestinal tract areas that sometimes become malignant);[9] (3) history of Graves disease; (4) diverticulosis/internal hemorrhoids; (5) GED that was controlled with Nexium; and (6) increased cholesterol.   [R137].

On April 27, 2004, Plaintiff complained of episodic lower left quadrant spastic pain for a ten month period.   The pain was worse when Plaintiff was laying on her left

_____

[9]   *See* National Cancer Institute, Dictionary of Cancer terms, http://www.cancer.gov/dictionary/?searchTxt=tubulovillous+adenoma+&btnGo.x=8 &btnGo.y=7&sgroup=Starts+with&lang= (last visited Mar. 10, 2008).

11

AO 72A
(Rev.8/8
2)

side, but it was alleviated when she was moving.  Plaintiff also reported having blood-coated stools.  [R135].

Plaintiff went to the Grady eye clinic on May 6, 2004, where she complained of left eye pain.  Plaintiff weighed 270 pounds and was noted to be obese.  Plaintiff was assessed with: (1) blepheritis, which looked good; (2) stable peripheral retinal hole; and (3) history of thyroid problems.  [R134].  Plaintiff went to Grady on May 25, 2004.  The doctor's notes are mostly illegible and do not appear to report any new conditions or symptoms.  [R132-33].

Plaintiff was seen by Dr. Marvin Grall, Ph.D. at the Grady Mental Health Services on August 3, 2004.  [R131].  Plaintiff reported: (1) a long history of dysthymia; (2) multiple family stressors including an autistic son; (3) increased eating for the last two months; (4) decreased sleep; (5) sadness and easy crying; (6) increased irritability; (7) suicidal ideation without plan or intent; and (8) decreased energy.  Plaintiff agreed to weekly therapy and medications.  Dr. Grall found Plaintiff to: (1) be oriented to place, time, person, and situation; (2) have a neat appearance; (3) have appropriate behavior; (4) have intact cognition; (5) be cooperative; (6) have fair insight into her illness; (7) have good interaction, memory, and  judgment; (8) have normal speech; (9) have appropriate thought content; and (10) have blunted mood/affect.

Dr. Grall assessed Plaintiff with: (1) moderate major depressive disorder on Axis I; (2) deferred on Axis II; and (3) hypertension and thyroid disease on Axis III. She was placed on Lexapro (an antidepressant and anti-anxiety drug). [R131].

Plaintiff went to see Dr. Terry Orme, Ph.D., on August 25, 2004, following a referral by her attorney. Plaintiff reported a troubled childhood that caused her to leave home sometime in the eighth grade to live with a man. Plaintiff received her GED. Plaintiff lived with her autistic son, her daughter, and her two grandchildren. [R148]. Plaintiff was last employed with Goodwill where she worked for five years but left in 1999 because it was hard for her to stand. Plaintiff had been charged with involuntary manslaughter when she was younger but the charges were dropped. Plaintiff reported no history of psychological or psychiatric care, but she started stress management class at Grady, which she had been attending for one month. Plaintiff indicated that she suffered from pain in her knees, ankles, and hands. Plaintiff reported that she had been taking Lexapro for two weeks, which was helpful. [R149].

Plaintiff reported that she woke at 6:30 a.m. to get her grandchildren ready for school and walk them to school across the street. She visited people at Goodwill and performed some gardening. [R149]. Plaintiff watched television, performed tasks around the house, and cooked every day. She took care of the children when they came

13

home, but went to her room when her daughter came home.  Plaintiff had been very depressed since her mother died.  Plaintiff could be impatient and she forgot a lot. [R150].

Dr. Orme found Plaintiff to be moderately obese, neatly groomed, and casually dressed.  Plaintiff was agitated a bit and disconcerted about having gotten soaked while traveling to Dr. Orme's office.  Plaintiff was cooperative, and she established a good rapport with Dr. Orme.  Plaintiff had normal speech patterns, but her mood was depressed and her affect saddened and tearful.  Plaintiff's continuity of ideas flowed well, and she had appropriate thought content.  Plaintiff had some problems with memory, and she had problems with sustaining concentration because of physical discomfort.  [R150].

Dr. Orme determined that Plaintiff read at the high school level and performed arithmetic at the fifth grade level.  He noted that Plaintiff's neuropsychological screening reflected longstanding learning disability problems, which were lifelong issues.  Plaintiff's full scale IQ was 76, which placed her within the borderline range of intelligence.  Plaintiff's psychomotor dexterity was significantly impaired.  [R151].

14

Dr. Orme gave the following diagnosis: (1) undifferentiated somatoform disorder[10] and major depressive disorder, recurrent, severe without psychotic features on Axis I; (2) borderline intellectual functioning on Axis II; (3) joint pain, hemorrhoid surgery, ulcer disease, acid reflux, and vision problems on Axis III; (4) social isolation and economic and occupations problems on Axis IV; and (5) a General Assessment of Functioning score of 53 on Axis V.  [R152].  Dr. Orme reported that Plaintiff was clearly depressed and having a difficult time coping at that point in time.  He believed that Plaintiff suffered from depressive symptoms for most of her life.  He recommended that Plaintiff receive ongoing psychological care.  Her prognosis was somewhat guarded due to the chronic nature of her psychological problems.  [R152].

Dr. Orme completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form.  He determined that Plaintiff had good ability to follow work rules and poor ability to deal with work stresses and maintain attention/concentration. He also found that Plaintiff had fair ability[11] to: relate to co-workers, deal with the

---

[10]    Undifferentiated Somatoform Disorder is the presence of unexplained physical complaints, lasting at least six months, that are below the threshold for a diagnosis of somatization disorder.  DSM-IV at 485, 490-92.

[11]    A good ability is defined as "[a]bility to function in this area is limited, but satisfactory."  A fair ability is defined as "[a]bility to function in this area is seriously limited, but not precluded."  A poor ability is defined as "[n]o useful ability

public, use judgment, interact with supervisors, and function independently. [R154].
Dr. Orme made these conclusions because Plaintiff appeared to try very hard to obey
rules and follow directions, but pain and depression inhibited her abilities in other
areas. [R154].

Dr. Orme determined that Plaintiff had a poor ability to understand, remember,
and carry out complex job instructions. Plaintiff had a fair ability to understand,
remember, and carry out detailed, but not complex, instructions, and she had a good
ability to understand, remember, and carry out simple job instructions. He made these
findings because: (1) Plaintiff's IQ fell within the borderline intellectual functioning
range; (2) Plaintiff's perceptual and organizational skills were severely depressed; and
(3) Plaintiff's memory and thought organization were quite compromised. Dr. Orme
also determined that Plaintiff had fair ability to maintain personal appearance and
demonstrate reliability, but she had a poor ability to relate predictably in social
situations and behave in an emotionally stable manner. These findings were based on
Plaintiff's depression, which affected her coping skills. [R155].

Dr. Orme finally found that Plaintiff had a substantial loss in a normal person's
ability to make simple work-related decisions and respond appropriately to co-workers.

———————————

to function in this area." [R154].

16

She had an extreme loss in a normal person's ability to respond appropriately to usual work situations, deal with changes in a routine work situation, and respond appropriately to supervisors. Plaintiff's mental symptoms could be expected to result in the failure to complete tasks in a timely manner for one or more hours in an eight-hour day on a chronic basis. Plaintiff's symptoms would cause her to have more than four absences per month. Plaintiff was not able to sustain competitive work on a regular continuing basis. [R157].

On September 16, 2004, Plaintiff went to Grady for management of hypertension. Plaintiff complained of pain on the left side of her head radiating to her left eye starting in June 2004 and continuing intermittently three times per week. The pain was relieved by Excedrin. [R129]. Plaintiff was assessed with: (1) increased cholesterol; (2) Graves disease, but the thyroid stimulating hormone was okay; (3) multifactorial vision problems plus increased blood pressure; and (4) hypertension that was not well controlled. The doctor instructed Plaintiff to get reading glasses and encouraged Plaintiff to exercise three times per week for thirty minutes, change her diet, and lose weight. [R130].

17

B.    *Evidentiary Hearing*

At the time of the evidentiary hearing, Plaintiff was 53 years old.  [R165].  She lived with her 19 year old autistic son,  her daughter, and her daughter's two children.  [R165-66, 168].  Plaintiff stood five feet, seven inches tall and weighed 270 pounds.  [R166].  Plaintiff tried to comply with her no salt and no fried food diet.  Plaintiff completed the eighth grade, and then received her GED in 1976.  [R167].

Plaintiff last worked in June of 1999, [R167], but she stopped because of her knee and some mental situations (she could not concentrate and she wanted to be alone), [R168, 172-73].  Plaintiff's most recent job at Goodwill involved standing and sorting clothes, which she performed for five years.  Prior to Goodwill, Plaintiff picked vegetables for two years.  [R169].  Plaintiff did not believe she could perform either of those jobs anymore.  Plaintiff did not know of any other jobs that she could perform because she could not stand and concentrate all day.  [R170].

Plaintiff indicated that her involuntary manslaughter charge was haunting her by causing her to sleep poorly and to feel like everyone was staring at her.  [R170-71].  The manslaughter charge was dismissed 22 years before the hearing.  [R172].

Plaintiff went to Grady hospital where she talked to Maria Graw.  Plaintiff was given Lexapro, but it "whacked" Plaintiff out, and she could not do anything but stay

18

in bed and sleep.  [R174-75].  Plaintiff went to a stress management class on a weekly basis for six weeks at Grady.  [R175].  These classes helped some by teaching her coping tactics.  [R175-76].  Plaintiff did not try other medications because of her bad experience with Lexapro.  [R176].

Plaintiff indicated that she could walk for 15 to 20 minutes without a break. Otherwise, her ankle would swell, which she hurt at Goodwill.  [R177].  Plaintiff would have to sit for 20 to 30 minutes before she could begin walking for 15 to 20 minutes. She spent most of her time laying in her bed.  [R178-79].  During Plaintiff's good days, she did some cleaning, watched television, and played with her grandchildren when they came home from school.  [R178].  On a bad day, Plaintiff just sat around in bed and did not leave her home.  [R179, 181].  The bad days out numbered the good days. [R180].  Plaintiff also had crying spells three to four times per month because of the involuntary manslaughter incident.  [R180-81].

Plaintiff testified that she could lift a 10-pound bag and maybe carry the bag 100 feet.  Plaintiff did not think that she could carry the 10-pound bag for one block. [R182].  Depending on the day, Plaintiff might be able to bend over and place a 10-pound bag on a table.  [R183].  Plaintiff did not have a problem sitting for 30 or 60 minutes.  [R184].  Plaintiff did not get any kind of exercise even though the doctors

19

encouraged her.  [R186].  She did not walk more because of her ankle and knee. [R187].

Plaintiff had difficulty with her vision, but she could not get her eye glass prescription filled because of financial constraints. [R184]. Plaintiff's vision got worse in 2005.  She's had blurred vision and floaters in her eyes for a few years. [R185].

The vocational expert ("VE") testified that an individual who basically stayed home in bed would be incapable of work activity.  [R188].  Also, an individual whose concentration problems interfered with her ability to achieve production standards would not be able to work.  The VE further testified that a hypothetical person who was capable of lifting and carrying 50 pounds occasionally and less weight frequently and who could stand and/or walk for 6 hours in an 8-hour day would be able to perform Plaintiff's past work.  Also, a person with a GED who was between 54 and 56 years old could perform other low stress jobs at the medium, unskilled level such as dining room attendant, linen room attendant, and day worker.  [R189-90].  The VE testified that an individual with the limitations in Dr. Orme's report could not engage in substantial gainful activity.  [R191].

20

### III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2004.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's depression is a "severe" impairment, based upon  the requirements in the Regulations (20 CFR §§ 404.1520 and 416.920).

4.  The medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to engage in and perform a full range of medium work.

7.  The claimant's past relevant work as a garment sorter, light unskilled work and as a vegetable picker, medium unskilled work did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

21

8.   The claimant's medically determinable depression does not prevent the claimant from performing her past relevant work.

9.   Given her age, education, work history and particular residual functional capacity, the claimant would be capable of performing other jobs that exists [sic] in significant numbers in the economy.

10.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

[R23-24].

The ALJ explained in relevant part that although Plaintiff had a severe impairment of depression, the depression would result in no more than mild restrictions of activities of daily living, social functioning, and maintaining concentration, persistence, or pace.  The ALJ found Plaintiff's Grave's disease, post ankle fracture, arthritic knee, and visual problems imposed no more than minimal limitations in Plaintiff's ability to perform work-related functions on a severe basis.  [R21].

The ALJ found Plaintiff to be "less than fully credible" because she: (1) was non-responsive to specific questions; (2) provided otherwise ambiguous answers to questions; and (3) had no medical support for her allegations of ankle pain.  The ALJ also discounted Plaintiff's description of her limited daily activities because: (1) the

22

activities could not be objectively verified with a reasonable degree of certainty; and (2) Plaintiff's medical condition would not explain the extent of the limitations described by Plaintiff.  The ALJ emphasized that Plaintiff was not taking medications or receiving the type of medical treatment that would be expected of a person who was totally disabled.   The ALJ described Plaintiff's treatment as "routine and/or conservative in nature."  [R22].

The ALJ noted that Dr. Orme found Plaintiff's IQ to be 69, but the ALJ indicated that there was no documentary evidence that Plaintiff had IQ scores of less than 70 before age 22.  Also, the ALJ found Dr. Orme's other listed impairments were not supported by the medical evidence.  The ALJ rejected Dr. Orme's opinion because: (1) it contrasted sharply with the paucity of mental health treatment and progress notes; (2) it was not supported by the longitudinal evidence of the record; (3) Plaintiff did not have any documentation of ongoing mental health problems; and (4) the opinion was obtained at the behest of Plaintiff's attorney.  [R22].

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to engage in a full range of medium work.  [R22].  With this RFC, the ALJ found that Plaintiff could return to her past relevant work as a garment sorter, or a vegetable picker, medium.  He also found that based on the VE testimony that Plaintiff could

AO 72A
(Rev.8/8
2)

perform other medium, unskilled work.  As a result, the ALJ found that Plaintiff was not disabled.  [R23].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step

AO 72A
(Rev.8/8
2)

sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments, which significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must

25

produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F.Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If substantial evidence supports the

AO 72A
(Rev.8/8
2)

Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal

27

principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*,

826 F.2d at 999.

## VI.    CLAIMS OF ERROR

Plaintiff identifies two issues in her brief: (1) substantial evidence did not support

the ALJ's evaluation of Plaintiff's mental impairments; and (2) the ALJ failed to

consider the combination of Plaintiff's impairments.  [Doc. 12 at 11-21].  Upon closer

inspection, however, the Court construes Plaintiff's brief to raise the following five

arguments: (1) the ALJ erroneously evaluated Dr. Orme's opinion; (2) the ALJ

erroneously evaluated Plaintiff's impairments; (3) the ALJ erroneously found that

Plaintiff had a high school education; (4) the ALJ's RFC determination failed to

account for Plaintiff's mental limitations; and (5) the decision should be reversed and

Plaintiff awarded benefits.  [*See id.* at 11-22].[12]  The Court addresses these five specific

arguments below.

---

[12]        At oral argument, Plaintiff stated that he was also arguing whether the ALJ properly accounted for the side effects of her medications.  This issue was not raised in the initial brief, so the Court finds that it was abandoned.  *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1269 (11th Cir. 2007) (indicating that issues raised for the first time in oral argument are not considered); *Herring v. Sec'y, Dept. of Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (noting that claims first raised in a reply brief are abandoned).

AO 72A
(Rev.8/8
2)

A.    *Evaluation of Dr. Orme's Opinion*

Plaintiff argues that the ALJ erred in discounting Dr. Orme's opinion because there was no other evidence for the ALJ to discount Dr. Orme's objective findings concerning Plaintiff's IQ, her neuropsychological screening, and her reading and arithmetic abilities. [Doc. 12 at 11-13]. Plaintiff also contests the ALJ's findings that Dr. Orme's report was not supported by the medical evidence. First, Plaintiff notes that the lack of formal diagnosis does not mean that she did suffer from depression because: (1) a medical note indicated that she was still having trouble dealing with grief ten months after her mother's death; (2) Dr. Grall noted Plaintiff's long history of dysthymia; and (3) a characteristic of dysthymia is that people do not seek help. [*Id.* at 18-19]. Second, Plaintiff complains that the ALJ's finding that the file did not reflect a deterioration of her mental health was contradicted by Plaintiff's testimony (about developing new symptoms and a feeling that people were staring at her) and her distress following her mother's death. [*Id.* at 19]. Third, Plaintiff argues that Dr. Orme's opinions are supported by his professional observations that she had a depressed mood, a saddened affect, memory loss, and concentration problems. [*Id.* at 19-20].

The Commissioner responds that the ALJ properly rejected Dr. Orme's opinion. [Doc. 14 at 17-20]. The Commissioner argues that substantial evidence supports the

29

ALJ's decision because Dr. Orme's opinion contrasts with the medical record in that Plaintiff did not complain of or seek treatment for depression prior to or after August 2004. [*Id.* at 18-19]. At oral argument, the Commissioner also argued that Dr. Orme's conclusions were internally inconsistent, which was further substantial evidence of the ALJ's conclusion that the medical evidence was not consistent with Dr. Orme's findings.

The Commissioner evaluates every medical opinion along with the rest of the relevant evidence in the case record. 20 C.F.R. §§ 404.1527(b), (d), 416.927(b), (d). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treating relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in claimant's case record. 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6). A one-time examining (*i.e.*, consulting) physician's opinion is not entitled to great weight. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004). An ALJ may reject the opinion of a medical expert when the evidence supports a contrary conclusion. *See Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir.

30

1987); *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (holding that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion"); *see also Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

"In cases involving mental illness, the opinions of mental health professionals are especially important." *Barber v. Barnhart*, 459 F. Supp. 2d 1168, 1173 (N.D. Ala. 2006). An ALJ "may not arbitrarily choose to ignore uncontroverted medical testimony." *Goodley v. Harris*, 608 F.2d 234, 236 (5th Cir. 1979).[13] "It is reversible error for an ALJ to reject uncontradicted medical evidence and fail to articulate adequate reasons for doing so." *Bright-Jacobs v. Barnhart*, 386 F. Supp. 2d 1295, 1341 (N.D. Ga. 2004) (citing *Ryan v. Heckler*, 762 F.2d 939 (11th Cir. 1985)).

The Court concludes that the ALJ erred in rejecting Dr. Orme's opinion. The five reasons given by the ALJ for rejecting Dr. Orme - - lack of showing of low IQ before Plaintiff was 22, paucity of mental health treatment, the absence of longitudinal treatment, the lack of documentation of mental health problems, and the opinion was obtained at the attorney's behest - - are not reasons that contradict Dr. Orme's diagnosis of severe, recurrent major depressive disorder, somatoform disorder, and borderline

---

[13]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the court adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

31

intellectual functioning.   The Court is unaware of any evidence from a medical professional that contradicts Dr. Orme's diagnoses.   The only other doctor who examined Plaintiff's mental health - - Dr. Grall from Grady - - supports Dr. Orme's conclusion because he also determined that Plaintiff had major depressive disorder, albeit with a moderate instead of a severe diagnosis.   Dr. Grall also prescribed Plaintiff with Lexapro.   [*See* R131].   The only potential contradictory evidence of which the Court is aware are brief notations that Plaintiff's "Psych" was normal and she had good energy with normal psychological functioning.   [R111-12, 139].   This evidence stems from physical examinations in which the doctors would not necessarily seek to make a mental health diagnosis and therefore is of limited value in contradicting Dr. Orme's opinion.   *See Elbert v. Barnhart*, 335 F. Supp. 2d 892, 912 (E.D. Wis. 2004) ("[T]here is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it.") (quoting *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)); *see also Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1219 (N.D. Ala. 2004) (quoting *Wilder*, 64 F.3d at 337).   Thus, there is uncontradicted evidence of Plaintiff's mental health by an individual who specializes in evaluating mental health. To reject Dr. Orme's opinion, the ALJ had to substitute his own opinion for that of the

AO 72A
(Rev.8/8
2)

medical professionals.   This the ALJ cannot do.   *See Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1363 (N.D. Ga. 2001) (citing cases and finding that the ALJ impermissibly substituted his opinion for that of the medical professional).

The present case is distinguishable from the Eleventh Circuit's decision in *Williams v. Barnhart*, 140 Fed. Appx. 932, 934 (11th Cir. 2005), where the court concluded that substantial evidence supported the ALJ's rejection of the examining consultant.   Here, Dr. Orme and Dr. Grall both diagnosed Plaintiff with depression. Also, Plaintiff's hearing testimony indicated that she could not perform her previous or other jobs, [R170], and that she was suffering from psychological symptoms, [R179-81].

The ALJ's rationales for rejecting Dr. Orme's reasons are of no assistance.   First, that Plaintiff went to Dr. Orme at the request of Plaintiff's attorney does not by itself impugn Dr. Orme's opinion.   Courts have stated that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it."   *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998).   Thus, "the mere fact that a medical report is provided at the request of counsel . . . is not a legitimate basis for evaluating the reliability of the report."   *Id.*; *see also Arroyo v. Barnhart*, 295 F. Supp. 2d 214, 220-21

33

(D. Mass. 2003) (citing *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747 (1st Cir. 1987)).  As discussed above, there is no evidence contradicting Dr. Orme's conclusions.  *Cf. Wooten v. Apfel*, 108 F. Supp. 2d 921, 927-28 (E.D. Tenn. 2000) (finding substantial evidence supported ALJ's decision to reject consulting psychiatrist requested by plaintiff's attorney because other mental health evidence contradicted the opinion).

Second, the Commissioner's focus on the lack of medical treatment and records for mental health problems is also problematic.  Courts have noted that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)); *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006).  This is so because "it is common knowledge that depression is one of the most under reported illnesses in the country" and "those afflicted often do not recognize that their condition reflects a potentially serious mental illness."  *Id.* (citing Warren E. Leavy, Hidden Depression, Chi. Trib., Feb. 1, 1996 at 7).  "Thus, the fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that Dr. [Orme's] assessment of claimant's

AO 72A
(Rev.8/8
2)

condition is inaccurate."  *Id.*; *see also Elbert*, 335 F. Supp. 2d at 912 ("[I]n th[e Seventh] Circuit, lack of mental health treatment does not automatically allow the ALJ to conclude that there is no mental impairment.").

At oral argument, the Commissioner cited Social Security Ruling ("SSR") 96-7p to show that lack of treatment is a basis for discounting the severity of the Plaintiff's depression as found by Dr. Orme.  The Court is unpersuaded.  First, the case law above indicates that lack of treatment should not be used as a basis for discounting mental impairments.  Second, SSR 96-7p deals with evaluating the credibility of a claimant concerning pain and other symptoms.  This Ruling requires an ALJ to consider a claimant's treatment for evaluating statements about pain and other symptoms.  *Id.*  The issue here is not Plaintiff's credibility concerning statements about her pain and other symptoms.  Instead, the issue is whether the evidence supports Dr. Orme's diagnosis, a situation to which SSR 96-7p does not appear to apply.

Third, that there was no documentary evidence that Plaintiff had an IQ score of less than 70 before 22 does not contradict Dr. Orme's IQ findings.  The results of an IQ test create a rebuttable presumption that mental retardation developed before the age of 22.  *Hodges v. Barnhart*, 276 F.3d 1265, 1267 (11th Cir. 2001).  Thus, that there is no evidence of Plaintiff's IQ before 22 is no reason to reject this finding.  Dr. Orme's

35

test results create a presumption that Plaintiff's IQ was below normal.  The ALJ has not

identified any contrary evidence.   Instead, Dr. Orme's testing of Plaintiff's

mathematical levels support the diminished IQ finding.  Also, Plaintiff's work history

as a vegetable picker and clothes sorter do not suggest a higher IQ.

The Commissioner cited the following two additional arguments for rejecting

Dr. Orme's opinion at oral arguments: (1) Dr. Grall's limitations stemming from

depression contradicted Dr. Orme's; and (2) Dr. Orme's limitations were internally

inconsistent with the factual background in the report.   These arguments are

compelling, but the Court ultimately concludes that they do not provide a basis for

affirming the ALJ's decision because the ALJ's opinion does not explicitly or implicitly

indicate that he relied on them.  A court cannot consider *post hoc* reasons for affirming

an ALJ's decision, and instead must confine its review to the validity of the grounds

upon which the ALJ based its decision.  *See Burlington Truck Lines, Inc. v. United

States*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's

post hoc rationalizations for agency action; [*SEC v.*] *Chenery* [*Corp.*, 318 U.S. 63, 87-

88 (1943),] requires that an agency's discretionary order be upheld, if at all, on the

same basis articulated in the order by the agency itself . . . ."); *see also Owens v.

Heckler*, 748 F.2d 1511, 1516 (11ᵗʰ Cir. 1984) (declining to affirm based on a rationale

36

that only might have supported an ALJ's decision); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The ALJ's decision should have been evaluated based solely on the reasons stated in the decision.").

The Court notes that the ALJ's opinion fails to make one reference to Dr. Grall. There is no discussion of Dr. Grall in the "Evaluation of the Evidence" portion of the decision, [R17-20], or in the ALJ's analysis of whether Plaintiff was disabled, [R21-23]. Thus, the Court cannot conclude that the inconsistency in Dr. Grall's limitations and Dr. Orme's limitations provides substantial evidence to reject Dr. Orme's opinion because there is no evidence that the ALJ considered Dr. Grall's opinion.

Likewise, the Court is unaware of any evidence that the ALJ relied on the internal inconsistencies of Dr. Orme's own report. The Court recognizes that Dr. Orme's report might have instances of inconsistencies. For instance, the Commissioner at oral argument observed that Dr. Orme determined that Plaintiff had a poor ability to relate in social situations but remarked that Plaintiff would go to Goodwill to socialize with former coworkers. Also, the Commissioner noted that Dr. Orme found Plaintiff to have a fair ability to function independently, but he also noted that she was a care giver to her son and grandchildren and had the ability to cook everyday. This evidence appears to demonstrate internal inconsistencies. But, the

37

ALJ's decision does not rely on these inconsistencies, so it is inappropriate for the Court to affirm the ALJ on a basis for which he did not consider.

The Commissioner stated at oral argument that his argument was not a post hoc rationalization because: (1) the ALJ rejected Dr. Orme's limitations on the basis that these limitations were not supported by the medical evidence of record; and (2) Dr. Orme's report is part of the medical evidence of record. The Court is unpersuaded by this argument. First, the Court notes that in its experience, ALJs routinely cite to both internal inconsistencies in a doctor's report and inconsistencies between a report and the medical record as bases for discounting a medical opinion. By explicitly making such a distinction, the ALJs suggest that these two factors - - internal inconsistencies and inconsistencies with the medical record - - are not the same. Second, the lack of discussion of internal inconsistencies in the ALJ's decision make it impossible for the Court to determine whether the ALJ relied on this basis. Instead of making a guess, the Court finds that the best course is for the Commissioner to clarify his reasons for rejecting Dr. Orme's opinion on remand.

As a result of the aforementioned discussion, the Court concludes that the ALJ did not provide an adequate basis to reject Dr. Orme's opinion. *See Jiles v. Comm'r of Soc. Security*, No. Civ.A. 05-G-0861-S, 2006 WL 4402937, at *5 (N.D. Ala. Sept. 11,

2006) (finding error when the "ALJ rejected the opinion of the only psychological specialist who examined the plaintiff" and citing cases with the same error).[14], [15]

_____

[14]   Those cases that have rejected a doctor's depression diagnosis appear to have had more medical record evidence concerning the claimant's mental health than is the case here. *See Owens v. Barnhart*, 400 F. Supp. 2d 885, 891 (W.D. Va. 2005) (finding substantial evidence supported ALJ's mental health determination because of claimant's lack of mental health treatment, aside from medication refills, his very minimal complaints regarding any alleged mental impairment, the state agency psychologists' findings that claimant suffered from non-severe mental impairments and the imposition of very minimal restrictions on claimant's mental abilities); *Streeter v. Barnhart*, No. 01 Civ. 4066, 2002 WL 467504, at *17-18 (S.D. N.Y. Mar. 28, 2002) (finding substantial evidence supported ALJ's decision to reject examining psychologist because the psychologist made the diagnosis based on plaintiff's self reports one week before administrative hearing and the opinion was contradicted by the inferences that can be fairly drawn from reliable medical evidence); *Gutka v. Apfel*, 54 F. Supp. 2d 783, 786-87 (N.D. Ill. 1999) (finding substantial evidence supported ALJ's decision to reject the only doctor to diagnose claimant with depression because various medical opinions rendered during that time reveal only three instances where any doctor commented on the plaintiff's mental state and contain no diagnosis of depression or prescriptions for related medication).

[15]   As noted in the text, the Court also finds *Williams*, 140 Fed. Appx. 932, to be inapplicable.  In *Williams*, the Eleventh Circuit found substantial evidence supported the ALJ's decision to reject a doctor's diagnosis of depression based on: (1) the claimant's failure to seek treatment for depression and anxiety; (2) the claimant's testimony at his administrative hearing that he did not feel stressed; and (3) evidence that the claimant exaggerated symptoms.  The instant case is similar to *Williams* only in that Plaintiff did not seek treatment for depression.  The other two factors from *Williams* are not present.  Instead, Plaintiff testified at her hearing that she had bad days where she laid in bed, [R178-79], she had crying spells, [R180-81], she had been prescribed Lexapro, [R174-75], and she had taken stress management classes, [R175].  As a result, Plaintiff, unlike the claimant in *Williams*, provided testimony consistent with Dr. Orme's diagnosis.

39

Without identifying contradictory evidence, the Court finds that the ALJ has substituted his opinion on a matter in which he is not professionally qualified for that of an opinion of a professional in the psychological profession. Accordingly, the Court **REVERSES** the Commissioner's disability determination.

B.      *Evaluation of the Medical Impairments*

Plaintiff argues that the ALJ erred in considering Plaintiff's condition because he ignored Dr. Orme's diagnoses of undifferentiated somatoform disorder and borderline intellectual functioning. [Doc. 12 at 13-14]. Plaintiff contends that her physical complaints concerning abdominal and arthritic pains could be explained by this somatoform disorder, but the ALJ never accounted for the somatoform disorder's relationship to these complaints. [*Id.* at 14]. Plaintiff also asserts that the ALJ did not consider that someone with borderline intellectual functioning requires greater supervision. [*Id.*]. He notes that the ALJ never mentioned Dr. Orme's finding of low IQ scores and psychomotor limitations. [*Id.* at 17]. Plaintiff notes that the ALJ treated Plaintiff as a high school graduate because of her degree, but Dr. Orme's test results showed that Plaintiff's abilities were not those of a high school graduate. [*Id.* at 17-18].

Plaintiff complains that the ALJ failed to consider the combination of Plaintiff's impairments because he ignored Plaintiff's mental impairments and discarded the other

40

impairments as non-severe.  [*Id.* at 20].  Plaintiff argues that the ALJ should have considered the combination in this case because Plaintiff's obesity, depression, and knee and ankle pain created a "vicious cycle" of keeping her immobile, which re-enforced her social isolation and prevented her from losing weight.  [*Id.* at 20-21].

The Commissioner responds that the ALJ properly considered Plaintiff's medical condition.  First, the Commissioner contends that the record is devoid of any evidence that Plaintiff complained of mental health problems until August 2004 or that she sought treatment thereafter.  [Doc. 14 at 12-15].  The Commissioner then argues that if the condition was as debilitating as Plaintiff had claimed, it is reasonable to assume that: (1) other medical doctors would have noted some problems; and (2) Plaintiff would have attempted to alleviate her problems by taking Lexapro as prescribed.  [*Id.* at 15].  Further, the Commissioner argues that there is no evidence that Plaintiff's symptoms or limitations lasted for a continuous period of 12 months.[16]  [*Id.* at 16-17].

_____

[16]     The Court rejects the Commissioner's argument for two reasons.  First, to the extent that the Commissioner contends that Plaintiff's depression had to last for 12 months, this is wrong.  The regulations state: "Unless your impairment is expected to result in death, it must have lasted *or must be expected to last* for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509, 416.909 (emphasis added).  This regulation does not require an impairment to last 12 months, only that the impairment last or be expected to last for a continuous period of 12 months or more.  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1216 (N.D. Ala. 2004).  Thus, that Plaintiff's depression did not last for 12 months is not

AO 72A
(Rev.8/8
2)

Second, the Commissioner argues that Plaintiff has failed to show that her somatoform disorder and borderline intellectual functioning interfered with her ability to perform basic work activities or perform unskilled work.  [*Id.* at 20-21].  Third, the Commissioner argues that the ALJ did not need to consider obesity, knee pain, or ankle pain because there are no medical diagnoses of these issues or treatment for these problems.  [*Id.* at 24-25].  The Commissioner further notes that Plaintiff's claims of impairment are undermined by her failure to follow her doctor's diet and exercise recommendations, by her failure to take consistently her medications, and by level of her activities.  [*Id.* at 25-26].

Plaintiff replies that substantial evidence does not support the ALJ's evaluation of Plaintiff's impairments.[17]   [Doc. 16 at 2-9].   First, Plaintiff argues that the Commissioner may not argue that Dr. Grall's opinion conflicted with Dr. Orme's

_____

conclusive.  Second, the ALJ determined that Plaintiff's depression was severe, which indicates that the ALJ found Plaintiff's depression either to have lasted 12 months or to have been expected to last for 12 months.  The Commissioner therefore cannot now argue a contrary position.

[17]   Plaintiff begins her reply brief by generally arguing that the Commissioner's brief makes the following three errors: (1) arguing that Plaintiff had to provide conclusive evidence of disability when the ALJ's duty is to weigh all evidence and to state reasons with particularity; (2) ignoring evidence; and (3) offering reasons for the decision upon which the ALJ did not rely.  [Doc. 16 at 1-2].

because the ALJ never made such a finding.  [*Id.* at 2-3].   Second, Plaintiff argues that there is no conflict between Dr. Grall's and Dr. Orme's opinions.  [*Id.* at 3].  Third, Plaintiff argues that the lack of mental health treatment can be explained by the nature of depression.  [*Id.* at 3].  Fourth, Plaintiff argues that she explained her reason for not taking her medication - - its side effects prevented her from caring for her child and grandchildren - - and the Commissioner's argument was not relied upon by the ALJ. [*Id.* at 4].  Fifth, Plaintiff argues that her depression was sustained for 12 months because Dr. Grall found the depression sustained and a Grady doctor found Plaintiff was having problems dealing with her mother's death.  [*Id.* at 4-5].  Sixth, Plaintiff argues that the ALJ's failure to consider borderline intellectual functioning is not harmless error because the ALJ did not weigh this impairment.  [*Id.* at 6].  Seventh, Plaintiff argues that the ALJ did not consider the somatoform disorder or provide a legitimate rationale for discounting it.  [*Id.* at 7].  Eighth, Plaintiff argues that the ALJ failed to explain why he found borderline intellectual functioning and somatoform disorder non-severe given that there was no evidence contradicting the findings.  [*Id.* at 8-9 & n.1].   Ninth, Plaintiff argues that the ALJ ignores evidence of some of Plaintiff's impairments, including her bowel problems.  [*Id.* at 9].  Tenth, Plaintiff

43

argues that the lack of findings concerning an ailment is insufficient to reject the ailment.  [*Id.* at 9-11].

> In cases where a claimant has multiple impairments, the regulations state:
>
> > In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. . . .

20 C.F.R. §§ 404.1523, 416.923.  Thus, the ALJ must consider all of a claimant's impairments in making a disability determination.  *See id.*; *Sneed v. Barnhart*, 214 Fed. Appx. 883, 887 (11th Cir. Dec. 22, 2006) (citing *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991)).

Given the Court's conclusion that the ALJ erred in evaluating Dr. Orme's opinion, the Court concludes that on remand, the Commissioner should re-evaluate the effect of Plaintiff's impairments on her ability to perform substantial gainful activity. The Commissioner should ensure that all of Plaintiff's impairments are considered prior to making the disability determination.  Plaintiff is correct that the ALJ's opinion failed

AO 72A
(Rev.8/8
2)

to mention Plaintiff's somatoform disorder[18] and her digestive problems, about which there is significant documentation.  The Court also notes that it is unclear whether the ALJ considered Plaintiff's hypertension.   [*See* R21].   Accordingly, the Court **REMANDS** for the ALJ to re-examine Plaintiff's impairments.[19]

C.   *The ALJ's Finding that Plaintiff Had a High School Education*

Plaintiff contends that the ALJ's finding that Plaintiff had a high school education was contrary to 20 C.F.R. § 404.1564(b), which defines a high school education as being able to reason, perform arithmetic, and acquire language skills

---

[18]      The Court is unsure that the Commissioner can extrapolate which physical complaints stem from Plaintiff's somatoform disorder.  Dr. Orme's opinion only provides a conclusory diagnosis as to somatoform disorder. [R152].  Plaintiff attempts to tie the undiagnosed problems with Plaintiff's somatoform disorder, but the ALJ does not have any basis to conclude that Plaintiff's pain stems from the disorder because Dr. Orme's opinion is not clear on the issue.  Also, the absence of complaints concerning certain pain in the medical notes also seems to give the ALJ a basis to reject certain complaints regardless of the somatoform diagnosis because it seems that Plaintiff would have complained to medical professionals about these problems.  As a result, the Court is not so certain that the ALJ erred in failing to tie Plaintiff's pains to the somatoform disorder.  However, since the ALJ failed to even mention the somatoform disorder, the Court cannot conclude that substantial evidence supported the ALJ's decision.

[19]      The Court finds that, contrary to Plaintiff's argument, the ALJ did account for Plaintiff's borderline intellectual functioning. [R22].  However, as discussed elsewhere in this Order, the ALJ's analysis of Plaintiff's IQ was not supported by substantial evidence.  As a result, the Commissioner should once again review Plaintiff's borderline intellectual functioning.

AO 72A
(Rev.8/8
2)

through formal schooling at a twelfth grade level.  [Doc. 12 at 13].  The Commissioner responds that the ALJ did not err in finding that Plaintiff had a high school education because Plaintiff received her GED.  [Doc. 14 at 19].  Also, the Commissioner argues that Plaintiff's argument is irrelevant because Plaintiff only needed a marginal education to perform unskilled work and Plaintiff did not show how her education level would prevent her from performing her past relevant work or other unskilled work identified by the VE.  [*Id.* at 19-20].  Finally, at oral argument, the Commissioner argued that Plaintiff's education is irrelevant because this case involves Step Four of in the disability evaluation process, which does not consider education.

The parties both agree that this is a step four case.  At step four, the ALJ determines whether a claimant can perform her past relevant work based on the claimant's RFC.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If a claimant cannot perform her past relevant work, the ALJ moves to "the fifth, and final, step[, which] requires the SSA to consider so-called 'vocational factors' (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003); *see also* 20 C.F.R. § 404.1560(c).  Thus, the ALJ does not consider the vocational factor of education at Step 4.  *See* 20 C.F.R.

46

§§ 404.1560(b)(3), 416.960(b)(3); *see also Christopher v. Astrue*, 479 F. Supp. 2d 1206, 1210 (D. Kan. 2007).  As a result, the Court concludes that, even if the ALJ had erred in determining Plaintiff's education level, this was harmless error because the education level is not considered at step four.

At oral argument, Plaintiff raised two arguments to suggest that the Court should consider the validity of the ALJ's education level finding: (1) the ALJ relied on education in determining that Plaintiff could perform past relevant work; and (2) 42 U.S.C. § 405(g) conflicts with the regulation.  The Court is unpersuaded by both arguments.  First, the ALJ made a finding at step four that Plaintiff could perform her past relevant work without considering her education level.  [*See* R23].  The ALJ then alternatively found that Plaintiff could perform other relevant work in the national economy at Step 5 by considering, *inter alia*, Plaintiff's education.[20]  [*See id.*].  There

---

[20]     If the Commissioner's analysis proceeds to Step 5 on remand and the Commissioner considers finding Plaintiff to have a high school education, the Commissioner should determine whether Plaintiff has "abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level." 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).  Although the Plaintiff holds a GED, the Commissioner should consider the following evidence in determining Plaintiff's education level: (1) the length of time between Plaintiff attaining her GED and applying for disability, *see* 20 C.F.R. § 404.1564(b); (2) Plaintiff's apparent failure to use the knowledge acquired with her GED in a work setting, *see id.*; and (3) the test results from Dr. Orme indicating that Plaintiff had borderline intellectual functioning and performed arithmetic at the fifth grade level, [R151].

47

is nothing erroneous about this analysis. Second, the Court finds no conflict between the judicial review provision at § 405(g) of the statute and the regulations considering vocational factors. Thus, the ALJ did not need to consider Plaintiff's education at step four.

Accordingly, the Court finds that any error in determining Plaintiff's education level was harmless.

D.      *The ALJ's Residual Functional Capacity Finding*

Plaintiff argues that the ALJ ignored evidence in making Plaintiff's mental RFC determination because the ALJ ignored Dr. Orme's opinion, which was the only evidence on the subject. Plaintiff contends that there is no medical evidence to support the ALJ's finding of mild restrictions of concentration, social functioning, and daily living activities. [Doc. 12 at 16]. The Commissioner rejects Plaintiff's suggestion that the RFC is a medical assessment or that it had to be based on a doctor's assessment because the ALJ's duty is to formulate the RFC. [Doc. 14 at 22]. The Commissioner then argues that the ALJ properly considered the evidence before assessing Plaintiff's RFC. [*Id.* at 22-23].

The RFC "assessment is made prior to, and used in, steps four and five of the five-part evaluation under 20 C.F.R. [§§ 404.1520, 416.920]." *Tauber v. Barnhart,*

48

438 F. Supp. 2d 1366, 1374 (N.D. Ga. 2006).  The RFC is the most sustained work activity that a claimant can perform in an ordinary work setting on a regular and continuing basis despite his physical and mental limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p.[21]  To evaluate the RFC, the ALJ must consider all of Plaintiff's impairments in combination.  *See Jones v. Bowen*, 810 F.2d 1001, 1006 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (indicating that the ALJ "will consider all of [claimant's] medically determinable impairments of which [the ALJ is] aware, including [the claimant's] medically determinable impairments that are not 'severe'"); SSR 96-8p (indicating that the RFC is based on "all of the relevant evidence in the case record").  Also, the RFC "must always consider and address medical source opinions." SSR 96-8p.  When the RFC conflicts with a medical source opinion, the ALJ "must explain why the opinion was not adopted." *Id.*  In making the RFC assessment, the ALJ must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p.

---

[21]     Social Security Rulings are binding on all components of the Social Security Administration.  *See Tauber*, 438 F. Supp. 2d at 1377 n.6.

AO 72A
(Rev.8/8
2)

The Court concludes that the ALJ should re-evaluate Plaintiff's RFC to determine whether an appropriate examination of Dr. Orme's opinion will change the RFC determination. The Court adds two comments concerning the RFC determination. First, to the extent that Plaintiff argues that the RFC is a medical determination, the Court disagrees. The regulations clearly indicate that the residual functional capacity is an issue "reserved for the Commissioner." *See* 20 C.F.R. § 404.1527(e)(2). Thus, it is the ALJ's responsibility to examine all of "the relevant medical and other evidence" to determine "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 1545(a)(1), (3). Although medical evidence is used to make a RFC determination, the RFC is not a medical determination as Plaintiff contends, but instead an administrative determination to assess whether a claimant is disabled.

Second, the Court notes that the ALJ's RFC determination as stated in the ALJ's opinion was insufficient.[22] Without any elaboration, the ALJ found that "the claimant retains the residual functional capacity to engage in and perform a full range of medium work." [R22]. The Commissioner requires that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her

---

[22]    Although Plaintiff did not raise the issue, the Court addresses it *sua sponte* to ensure that this error is corrected on remand.

AO 72A
(Rev.8/8
2)

work-related abilities on a function-by-function basis . . . .  Only after that may RFC

be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy,

and very heavy."  SSR 96-8p.  The ALJ never performed the function-by-function

analysis before determining that Plaintiff could perform a full range of medium work.

This was error.  *See e.g.*, *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 208 (W.D.N.Y.

2005) ("Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC,

his determination that she had the RFC for sedentary work is not supported by

substantial evidence."); *Jones v. Barnhart*, 372 F. Supp. 2d 989, 1005 (S.D. Tex. 2005);

*Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1058 (E.D. Wis. 2005); *Jesse v. Barnhart*,

323 F. Supp. 2d 1100, 1110 n.49 (D. Kan. 2004) (citing *Alexander v. Barnhart*,

74 Fed. Appx. 23, 28 (10th Cir. Sept. 2, 2003), for the proposition that "the ALJ's RFC

determination [is] not supported by substantial evidence where the ALJ failed to make

a proper function-by-function analysis").  As a result, the ALJ should comply with SSR

96-8p when determining Plaintiff's RFC on remand.   Accordingly, the Court

**REMANDS** for the Commissioner to re-evaluate Plaintiff's RFC.

> E.     *The Relief Sought*

Plaintiff argues that the ALJ's decision should be reversed and she should be

awarded disability benefits because the VE testified that a person with the limitations

51

set forth in Dr. Orme's report would not be able to engage in substantial gainful activity. [Doc. 12 at 21-22]. Alternatively, Plaintiff seeks remand for a new hearing and instruction for the ALJ to avoid its errors. [*Id.* at 22]. Defendant contends that there was no error, so the ALJ's decision should be affirmed. [*See* Doc. 14]. Plaintiff argues that the case should only be remanded for a new hearing in the reply brief. [Doc. 16 at 11]. Thus, Plaintiff appears to have altered her relief request by dropping the request for benefits. At oral argument, Plaintiff clarified that she was seeking remand for benefits.

The Court concludes that the case should be reversed and remanded for further proceedings, not for benefits. Although the Court has found that the ALJ did not properly evaluate Dr. Orme's opinion, this error does not require an award of benefits. Under the Eleventh Circuit case law, courts must accept a treating physician's opinion as true when the ALJ fails to properly evaluate the opinion. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) ("Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."). Dr. Orme is not a treating psychologist, but instead is a one-time examining doctor. Thus, the Court is under no obligation to treat this testimony as true even if the VE determined that a person with the limitations found by Dr. Orme

52

would be unable to perform competitive work. Instead, the Commissioner may want to obtain a consulting psychologist's opinion. *See Ford v. Sec'y of Health and Human Servs.*, 659 F.2d 66, 69 (5th Cir. Unit B Oct. 15, 1981) (holding that the ALJ erred in failing to obtain a consultative psychiatric examination where other evidence in the record indicated that plaintiff suffered from psychological problems);[23] *see also Reeves v. Bowen*, 841 F.2d 383, 385 (11th Cir. 1988) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.").

The Court permitted Plaintiff to file supplemental authority on the issue of the remedy, [Doc. 20], which Plaintiff has done, [Doc. 21]. Defendant has submitted a response. [Doc. 22]. Plaintiff recognizes, and Defendant emphasizes, that the case she referred to at oral argument - - *Hambrick v. Sullivan*, No. 1:90-cv-380-CAM (N.D. Ga. Mar. 5, 1991) - - involved a treating physician. The Court therefore finds the case distinguishable for the reasons discussed above. Also, Plaintiff has identified three other cases to support his argument that the proper remedy is an award of benefits. The Court finds *Flynn v. Heckler* unpersuasive on the issue because it did not involve a

---

[23]     In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted all decisions of Unit B of the former Fifth Circuit as binding precedent.

AO 72A
(Rev.8/8
2)

remand for benefits.  768 F.2d 1273, 1275 (11th Cir. 1985).  Also, the Court is not persuaded by the *MacGregor* case because, as Plaintiff recognizes, the case was remanded for benefits due to a number of errors and the treating orthopedist in *MacGregor* found Plaintiff disabled.  *MacGregor*, 786 F.2d at 1053-54.  There is no treating doctor in the instant case, so the Court will not rely on *MacGregor*.

Finally, the Court finds that although *Goodley v. Harris*, 608 F.2d 234 (5th Cir. 1979), is on point, it does not mandate a reversal for benefits.  In *Goodley*, the former Fifth Circuit reversed and remanded for an award of benefits because a consulting psychiatrist and a non-examining general practitioner both determined that Plaintiff was unable to work without contradiction from any other doctors.  *Id.* at 237.  The Court does not read, however, *Goodley* to require a remand for benefits whenever non-treating doctors' opinions are uncontradicted.  The former Fifth Circuit merely noted that it "often" reversed decisions when the uncontradicted medical evidence indicated that the claimant is disabled.  *Id.* at 236-37.  The *Goodley* Court's use of "often" indicates that courts in this Circuit are not required to award benefits in all cases of uncontradicted evidence.  As a result, the Court finds that it need not remand for an award of benefits.  The Court instead concludes that the better course is to remand for the Commissioner to reevaluate all medical evidence to make a disability determination

54

including an examination of Dr. Grall's opinion and the consistency of Dr. Orme's report.

Accordingly, the Court **REVERSES** the Commissioner's disability determination and **REMANDS** the case to the Commissioner for proceedings consistent with this Opinion and Order.

## VII.   CONCLUSION

Based on the foregoing discussion, the Court **REVERSES** and **REMANDS** the Commissioner's disability determination for proceedings consistent with this Opinion and Order.

Pursuant to the Eleventh Circuit's suggestion in *Bergen v. Commissioner of Social Security*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), Plaintiff **SHALL** have until **ninety (90) days** after he receives notice of any amount of past due benefits awarded to seek attorney's fees under the Social Security Act, 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, No. 07-11298, 2008 WL 73668 at * 1 n.1 (11th Cir. Jan. 8, 2008).

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 11th day of March, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)